1
2
3
4                    UNITED STATES DISTRICT COURT
5                    NORTHERN DISTRICT OF CALIFORNIA
6

7    SAMEH HUSSEIN,                          Case No.  11-cv-05317-JST
            Petitioner,
8
     v.                                      **FINDINGS OF FACT AND
9                                            CONCLUSIONS OF LAW**
     ROBIN BARRETT, et al.,
10
            Respondents.
11

12

13          Before the Court is Petitioner Sameh Hussein's petition seeking *de novo* review of the

14   denial of his application for naturalization filed November 2, 2011, pursuant to 8 U.S.C. §

15   1421(c).  The United States Citizenship and Immigration Services ("USCIS") denied Petitioner's

16   application for naturalization on December 9, 2010, for failure to satisfy the Immigration and

17   Naturalization Act's ("INA") "good moral character" requirement, based on an allegation of tax

18   fraud.  Petitioner's administrative appeal was subsequently denied on the same basis.  After

19   Petitioner filed for review of that decision in this Court, USCIS stipulated to withdraw its

20   allegation of tax fraud as a basis for denial of Petitioner's application, but indicated its intent to

21   continue to oppose Petitioner's application for naturalization on the grounds of false testimony

22   given during the application process.  The Court held a bench trial on December 2, 2013.  Having

23   carefully considered the parties' exhibits, testimony, trial briefs, post-trial briefs, and controlling

24   legal authorities, the Court will deny the petition.

25   **I.     LEGAL STANDARDS**

26          District courts are authorized to review denials of applications for naturalization after a

27   hearing before an immigration officer.  "Such review shall be de novo, and the court shall make its

28   own findings of fact and conclusions of law and shall, at the request of the petitioner, conduct a

United States District Court
Northern District of California

1    hearing de novo on the application." 8 U.S.C. § 1421(c).  The district court "does not defer to any

2    of the INS' findings or conclusions." United States v. Hovsepian ("Hovsepian I"), 359 F.3d 1144,

3    1162 (9th Cir. 2004).

4         The applicant bears the burden of establishing each of the statutory requirements for

5    naturalization.  8 C.F.R. § 316.2(b).  Among the requirements applicants for naturalization must

6    meet is the requirement that, for the five years preceding the filing of the application, the applicant

7    "has been and still is a person of good moral character, attached to the principles of the

8    Constitution of the United States, and well disposed to the good order and happiness of the United

9    States." 8 U.S.C. § 1427(a)(3).  The INA does not define the term "good moral character."

10   Hovsepian I, 359 F.3d at 1166.  However, the INA does enumerate nine non-exclusive

11   characteristics that preclude a finding of good moral character, including the giving of "false

12   testimony for the purpose of obtaining any benefits under" the INA.  8 U.S.C. § 1101(f)(6).

13        "Testimony" refers only to oral statements made under oath; it does not include falsified

14   documents or statements not made under oath.  Kungys v. United States, 485 U.S. 759, 780

15   (1988).  The bar on false testimony applies to misrepresentations "'made with the subjective intent

16   of obtaining immigration benefits,' whether or not the misrepresentation is material to the

17   immigration decision." United States v. Hovsepian ("Hovsepian II"), 422 F.3d 883, 887 (9th Cir.

18   2005) (quoting Kungys, 485 U.S. at 779).  "Whether a person has the subjective intent to deceive

19   in order to obtain immigration benefits is a question of fact."  Id.

20        In addition, "[u]nless the applicant establishes extenuating circumstances, the applicant

21   shall be found to lack good moral character if, during the statutory period, the applicant . . .

22   [c]ommitted unlawful acts that adversely reflect upon the applicant's moral character, or was

23   convicted or imprisoned for such acts, although the acts do not fall within the purview of §

24   316.10(b) (1) or (2)." 8 C.F.R. § 316.10(b)(3)(iii).

25        Petitioner bears the burden of establishing good moral character by a preponderance of the

26   evidence.  Hovsepian I, 359 F.3d at 1168.  However, the Court notes that "there must be strict

27   compliance with all the congressionally imposed prerequisites to the acquisition of citizenship."

28   Fedorenko v. United States, 449 U.S. 490, 506 (1981).  Any doubts as to whether Petitioner has

2

1   met his burden "should be resolved in favor of the United States and against the claimant."

2   Berenyi v. District Director, INS, 385 U.S. 630, 636–37 (1967) (quoting United States v.

3   Macintosh, 283 U.S. 605, 626 (1931)).

4   **II.     FINDINGS OF FACT**

5          Most of the facts related to Petitioner's application for naturalization are not in dispute.

6   Petitioner is a native citizen of Egypt who entered the United States on January 4, 1996, on a

7   student visa.  He obtained lawful permanent resident status on April 5, 2000.  He filed his N-400

8   application for naturalization on September 15, 2005.  That application was denied on December

9   9, 2010 after USCIS found Petitioner lacked good moral character based on a conclusion that he

10  had committed tax fraud.  Petitioner denied that he had committed tax fraud and claimed any

11  discrepancies were innocent mistakes that were corrected with amended tax returns.  Petitioner

12  filed a N-336 Request for a Hearing on a Decision in Naturalization on January 7, 2011.  USCIS

13  denied that request on July 7, 2011 after concluding that Petitioner had not overcome the finding

14  of tax fraud.

15         Following the filing of the instant action, USCIS stipulated not to pursue the tax fraud

16  allegations further, and changed the grounds upon which it opposes Petitioner's naturalization.

17  USCIS now argues Petitioner lacks good moral character because he gave false testimony at his

18  naturalization interviews on March 11, 2010, and June 22, 2010.  In particular, Petitioner testified

19  that he has only been married once, to Debra Hawley, on February 8, 1999.  Petitioner and Ms.

20  Hawley divorced on August 5, 2008.  USCIS claims that Petitioner also entered into a religious

21  marriage ceremony with Stacey Mabrey while he was married to Ms. Hawley, and that he omitted

22  that information from his interviews.

23         It is undisputed that Petitioner had three biological children with Ms. Mabrey, born in

24  2005, 2006, and 2008.  He also cared for Mabrey's two children from another relationship.

25         USCIS stipulates that Petitioner satisfies all the statutory and regulatory requirements for

26  naturalization other than the good moral requirement.  In dispute is whether Petitioner entered into

27  a religious marriage with Ms. Mabrey while legally married to Ms. Hawley, rendering Petitioner's

28  testimony during his naturalization interviews false.

United States District Court
Northern District of California

3

### A.     Religious Blessing

At trial, Hussein testified that Mabrey became a friend of his and Hawley's in 2000, but that Hussein and Mabrey did not begin their romantic relationship until after Hussein separated from Hawley, in 2003.  Trial Tr. at 30–34.  According to Hussein, in November or December of 2003, Hussein's friend Sherif Abdel Aziz performed a religious "blessing" for the couple in Madison, Wisconsin.  Id. at 42–44.  The blessing lasted less than thirty seconds.  Id. at 43:18–19.  Aziz corroborated Hussein's version of events, and explained that the blessing is a recitation of the first verse of the Koran.  Id. at 134–36.  According to Aziz, the blessing is meant to protect a new relationship and to reflect the couple's commitment to each other.  Id. at 135.  Aziz testified that the blessing does not constitute a marriage in Islam, does not guarantee the couple will one day be married, and does not constitute an engagement to be married.  Id. at 138–39.  According to Aziz, for a marriage to be recognized in the Islamic faith, there must be two witnesses, a wali (or guardian for the bride), an imam, a dowry, and a publication of the marriage to the couple's family and friends.  Id. at 137–38.  The religious blessing Aziz performed in 2003 for Hussein and Mabrey did not satisfy any of those requirements.  Id. at 138.

### B.     Evidence That Hussein and Mabrey Were Married

Hussein and Mabrey had three children together.  Id. at 46.  Hussein testified that when the couple separated in 2009, Mabrey took the children to Qatar and refused to return to the United States.  Id. at 74–75.  In attempting to force Mabrey to return the children, Hussein contacted various law enforcement agencies.  The Government contends that Hussein told FBI Special Agent Daniel Rodriquez, on December 27, 2011, that Hussein and Mabrey were married as part of his attempt to recover his children.  Hussein testified as follows:

> I don't recall saying these exact words.  I may have said it.  I'm not denying that I may have said that.  Like I said before, it was just easier to refer to her as my wife rather having – than having to go through all explanation.  But I may have said it.  I'm not sure.  I don't recall right now.

Id. at 93–94.  In response, the Government read into the record portions of its Impeachment Exhibit H, which consists of three FBI reports dated October 18, 2011, December 27, 2011, and January 13, 2012.  The December 27 report indicates that Hussein told Special Agent Rodriguez

4

United States District Court
Northern District of California

he was married.  Id. at 95.  In addition, the January 13, 2012 report indicates that Hussein told Special Agent Rodriguez that he married Mabrey in 2003 — the same year as the religious blessing.  Id. at 97.  Plaintiff objects now that the exhibit was never admitted into evidence and is therefore not properly evidence before the Court, but the relevant portions of the report were read into the record without objection.  Id. at 94–98.

Hussein also contacted the Elk Grove Police Department as part of his efforts to force Mabrey to return their children to the United States.  Hussein admitted telling an Elk Gove detective that Mabrey was his wife.  Id. at 103.  In addition, Hussein testified that he was "in the habit of calling" Mabrey his wife "sometimes," especially when speaking to "officials," because he wanted to "avoid public embarrassment and avoid having to go through all that explanation."  Id. at 100–01.

The Court concludes that Hussein has repeatedly represented to law enforcement officials, in connection with his custody dispute with Mabrey, that he was married to her.  That evidence, however, does not lead the Court to conclude that Hussein was, in fact, married to Mabrey.  It appears instead that he misrepresented to law enforcement that he was married because he desired to avoid embarrassment, and perhaps also because he thought it would help his cause.

Separately, the Government contends that Hussein swore under penalty of perjury in a declaration submitted to the Sacramento County Superior Court in connection with the couple's custody dispute that Hussein and Mabrey "were never married in California.  However, we were married under Islamic rules on December 13th, 2003 and our marriage is considered legal in Egypt where I am a citizen."  Id. at 93.  Plaintiff objects that the declaration, which is the Government's Impeachment Exhibit E, was never admitted into evidence and is therefore not properly before the Court, but, as with Impeachment Exhibit E, the relevant portions were read into the record without objection.  Moreover, even without the exhibit, Hussein's testimony confirmed that the declaration stated he was married, and that he signed it.  Instead, Hussein claims that his family law attorney asked him, because of time and page constraints, to sign a blank signature page for a declaration that his attorney drafted, and that he never reviewed.  Id. at 112.  He testified that he was "shocked" to find on the declaration that his attorney wrote he and Mabrey had been married.  Id.

He also testified that he never told his family law attorney that he had been married on December 13, 2003, or that the marriage was considered legal in Egypt.  Id. at 113.  He claimed his attorney explained after the fact that it would look better to the court if the couple were married.  Id.  He also claimed that he asked the attorney to correct the declaration.  Id. at 114.  As for the specificity of the date contained in the declaration, Hussein testified that he told his attorney about the religious blessing that occurred in 2003.  Id. at 115.

Finally, Hussein testified that Mabrey filed for divorce from him in Qatar, though he never participated in those proceedings.  Id. at 76, 119–22.  According to Hussein, Mabrey told him that she had filed for divorce because it was advantageous to Mabrey to claim she had been married for purposes of securing residency, permission to work, and benefits in Qatar.  Id. at 122–24.  He also testified that Mabrey believed filing for divorce in Qatar would advantage Mabrey in the couple's ongoing custody dispute.  Id. at 125.

The declaration and the fact that Mabrey filed for divorce in Qatar do, as the Government argues, weigh in favor of a finding that Hussein and Mabrey were, in fact, married.  However, taking the evidence as a whole, the Court finds that it is more likely than not that Hussein and Mabrey entered into a religious blessing meant to reflect their commitment to each other in late 2003, but that the blessing did not constitute a legal or religious marriage.  However, as the Court discusses in further detail below, the Court does not find Petitioner's testimony concerning the declaration and its preparation credible, and finds that it is more likely than not that Petitioner knowingly misrepresented to the Sacramento Superior Court that he was married to Mabrey because he perceived the misrepresentation would benefit him in his custody dispute.

## III.   CONCLUSIONS OF LAW

The Government contends that Hussein lacks good moral character within the meaning of 8 U.S.C. § 1101(f)(6) because he gave false testimony at his naturalization interviews, his deposition, and at trial, when he testified that he was married only once, to Ms. Hawley.  Because the Court finds that it is more likely than not that Hussein and Mabrey were never married, either legally or in a religious ceremony, the Government's argument fails.

However, the Court concludes that Hussein's petition must be denied for a different

United States District Court
Northern District of California

reason:  his repeated false representations, at least one of which was under oath, show him to "lack good moral character" under the relevant regulation.[1]  "Unless the applicant establishes extenuating circumstances, the applicant shall be found to lack good moral character if, during the statutory period, the applicant: . . . (iii) Committed unlawful acts that adversely reflect upon the applicant's moral character, or was convicted or imprisoned for such acts, although the acts do not fall within the purview of § 316.10(b) (1) or (2)."  8 C.F.R. § 316.10(b)(3)(iii).  See United States v. Dang, 488 F.3d 1135, 1141 (9th Cir. 2007) (upholding validity of regulation because "requiring consideration of an applicant's unlawful acts during the five-year moral character period — whether or not the applicant is convicted for the acts during that period — is not beyond the agency's statutory mandate").  No conviction is necessary for the unlawful acts provision to apply. Id.

Other courts have reached similar conclusions on similar facts.  For example, in Meyersiek v. U.S. Citizenship & Immigration Servs., 445 F. Supp. 2d 202, 206 (D.R.I. 2006), the petitioner had applied for long-term disability benefits even though he had been terminated from his employment for misconduct and not his disability.  While the petitioner was applying for benefits, he also engaged in an effort to find a new job.  Although the evidence was mixed, the district court denied the petition for naturalization for lack of good moral character because the "discrepancy" between the petitioner's report to the disability plan and his efforts to secure a new job "gives rise to an inference that Petitioner purposefully exaggerated his limitations to support his claim of 'total disability,' thereby inducing [the disability plan] to act favorably on his claim for long-term disability benefits."  Id. at 207.  The district court noted that "where there is smoke, there is not always fire, and this Court cannot, on this record, make a conclusive finding that Petitioner intended to commit insurance fraud.  It is enough, however, to find that Petitioner's actions, with all doubts resolved against him, fit within the preclusive language of 8 C.F.R. § 316.10(b)(3)(iii)."

---

[1] At the conclusion of the trial, the Court invited the parties to brief the separate question of whether, should the Court conclude that Hussein misrepresented the nature of his relationship with Mabrey to law enforcement authorities and the Sacramento County Superior Court, the Court should conclude that Hussein lacks good moral character for purposes of his naturalization application.  Trial Tr. at 207–08.

United States District Court
Northern District of California

1    Id.  See also Abdi v. U.S. Citizenship & Immigration Servs., 923 F. Supp. 2d 1160, 1166 (D.

2    Minn. 2013) (claimant lacked good moral character based on dishonesty with law enforcement).

3         Determining whether Petitioner's Sacramento Superior Court declaration was knowingly

4    false, and therefore perjurious, boils down to a basic issue of credibility.  Petitioner testified that

5    he signed the signature page without reading the contents of the declaration and that he was

6    unaware that he (through his lawyer) had represented that he was married to Mabrey.  But his

7    testimony requires the Court to believe that he gave his lawyers all the facts necessary to draft the

8    declaration, including the details of the 2003 blessing, *except* that he married Mabrey at the same

9    time – in other words, that Hussein's lawyer made up that one fact, and only that one fact, out of

10    whole cloth.  The Court does not credit this explanation.  Rather, the Court adopts the far more

11    likely inference that Hussein told his lawyer what he had repeatedly told other people, including

12    law enforcement officers, whenever it seemed convenient or helpful:  that he *was* married to

13    Stacey Mabrey.  Thus, even if Hussein signed a blank, orphan signature page – an explanation the

14    Court also does not accept – he did so knowing that his false version of events would be placed

15    into the body of a declaration he was signing under penalty of perjury.  This explanation not only

16    makes more sense, but it is more consistent with the pattern of Hussein's behavior and with the

17    standard that requires doubts in this proceeding to be resolved in favor of the Government.

18         Relying on Torres-Guzman v. I.N.S., 804 F.2d 531, 534 (9th Cir. 1986), Petitioner argues

19    that the Court must weigh the "counterbalancing factors" that evidence his good moral character

20    because "in the absence of a congressionally imposed *per se* rule, a statutory direction to

21    determine the presence or absence of good moral character requires the fact finder to weigh and

22    balance the favorable and unfavorable facts or factors, reasonably bearing on character, that are

23    presented in evidence."  Id.  Petitioner ignores, however, that 8 C.F.R. § 316.10(b)(3)(iii) is an

24    enumerated factor, and there can be no question that perjury is a crime that adversely reflects on

25    an applicant's good moral character.  Thus, the *per se* category contained in the regulation

26    obviates the need for counterbalancing.  Even so, if it were required pursuant to Torres-Guzman,

27    the Court finds that the repeated misrepresentations made by Petitioner are not isolated incidents.

28    Instead, as discussed above, Petitioner's misrepresentations are part of a pattern of conduct to

1   which Petitioner himself admitted.

2       Moreover, Petitioner has not submitted any evidence of extenuating circumstances for his

3   misrepresentations, and the bulk of the evidence of Petitioner's moral character unrelated to the

4   misrepresentations at issue comes directly from the testimony of Petitioner himself, which

5   testimony the Court has found to lack credibility.

6       Considering the evidence as a whole, and because the Court is obligated to resolve any

7   doubts it may have of Petitioner's moral character in the Government's favor and against

8   Petitioner, <u>Berenyi</u>, 385 U.S. at 630, the Court holds that the above facts preclude a finding of

9   good moral character in this case.  Like the court in <u>Meyersiek</u>, this Court cannot find conclusively

10  that Petitioner committed perjury, but no such finding is necessary.  Petitioner has failed to satisfy

11  his burden of establishing good moral character.  For this reason, the petition is hereby DENIED.

12      **IT IS SO ORDERED.**

13  Dated:  May 12, 2014

14  _____

15                    JON S. TIGAR
                United States District Judge

16

17

18

19

20

21

22

23

24

25

26

27

28

9